UNITED STATES DISTRICT COURT

DISTRICT OF OREGON


JUAN DIAZ-AVALOS,                                 Case No. 6:11-cv-00969-HZ

       Petitioner,                                OPINION AND ORDER

   v.

JEFF PREMO,

       Respondent.


   KRISTINA S. HELLMAN
   Assistant Federal Public Defender
   101 S.W. Main Street, Suite 1700
   Portland, OR  97204


       Attorney for Petitioner


   ELLEN F. ROSENBLUM
   Attorney General
   ANDREW D. HALLMAN
   Oregon Department of Justice
   1162 Court Street, NE
   Salem, OR  97301


       Attorneys for Respondent


   1 - OPINION AND ORDER -

Hernandez, District Judge.

Petitioner, an inmate in the custody of the Oregon Department of Corrections brings this habeas corpus action pursuant to 28 U.S.C. § 2254. He alleges his convictions and sentence for Manslaughter and Failure to Perform Duties of a Driver were obtained in violation of the Fourteenth Amendment to the United States Constitution when the trial court failed to suppress a faulty eyewitness identification. For the reasons set forth below, the Amended Petition for Writ of Habeas Corpus (#31) is DENIED, and this proceeding is dismissed with prejudice.

## BACKGROUND[1]

On June 19, 2003, at approximately 9 p.m., police received reports of a pickup truck sparking and dragging a bicycle under its right front bumper, and reports of a hit-and-run accident in Northeast Portland. Officers responding to the hit-and-and run found a victim, deceased, at NE 148th and San Rafael Avenue.

One of the witness who reported the truck, Ms. McReynolds, was driving southbound on NE 148th when she noticed a pickup coming up behind her, sparking and dragging a bicycle under its bumper. She moved to the left lane and watched as the truck passed her and turned right. The sparks and the bicycle under the bumper prompted McReynolds to report a description of the truck and its license

---

[1]The information in this section is taken from Petitioner's Brief (#32) and from the transcript of the state court proceedings (#26).

plate number.  McReynolds then drove back in the direction from which she and the truck had come to see if someone was in need of assistance.  In doing so, she came upon the scene of accident. There, she spoke with investigating officers.

Officers responding to the hit-and-run found that no one had witnessed the collision.  However, based on McReynolds statements, Officer Sorensen took her to the location where a subject was detained following a traffic stop.  Petitioner was that subject.

While seated in Officer Sorensen's patrol car, McReynolds received a field admonishment from Officer Gallaghar.[2]  Officer Sorensen then moved his patrol car forward, allowing McReynolds to view Petitioner.  He stood facing her, approximately 24 feet away, illuminated by patrol car spot lights.  She asked to see Petitioner from his left side, the view she had of the driver on NE 148th. She then identified Petitioner as the driver she had seen.  After McReynolds made the identification, Officer Sorensen again moved his patrol car forward to give her a view of the truck Petitioner was driving when stopped by police.  She immediately identified it as the vehicle she had reported.

Portland police conducted an investigation over a period of weeks following the June 19th hit-and-run.  On September 23, 2003, a Grand Jury indicted Petitioner on charges of Manslaughter in the First Degree, Failing to Perform the Duties of a Driver, and

---

[2]Details of the field admonishment and show-up procedures are included in the testimony cited below.

Driving while Under the Influence of Intoxicants.  (Respt.'s Ex. 102.)

Suppression Hearing

In a pre-trial hearing held April 5, 2004, Petitioner moved to suppress McReynolds' identification.  He argued the identification procedure was unduly suggestive and violated his due process rights.  The trial court heard testimony from Officer Gallaghar, Officer Sorensen, and McReynolds.[3]  (Tr. Vol. 2 at 20-72.)  The court also heard testimony from Officer Busse regarding light conditions at 9 p.m. on June 19 and 20, 2003.

Officer Gallaghar testified: he had been a Portland police officer for nearly 13 years; he had been assigned as the primary officer to respond to the call of a vehicle dragging a bicycle; another officer was assigned to respond to the report of a hit-and-run, received a minute or less after the sparking vehicle calls; when Officer Sorensen arrived with McReynolds at the location where he had Petitioner detained, Sorensen stopped his patrol car about a half a block away; he went to Officer Sorensen's patrol car and gave McReynolds a field admonishment as she sat in the car; after the admonishment, Officer Sorensen pulled his vehicle forward to

_____

[3]Defense counsel called and questioned Officer Gallagher as the first witness, with the State conducting the cross-examination. After Gallagher's testimony, the State questioned counsel's calling of its witnesses.  The court clarified that the State had the burden of proof on eyewitness testimony, and the State proceeded to call its subsequent witnesses, followed by defense counsel's cross-examination.

allow McReynolds to see Petitioner, who was out of the patrol car.

Officer Gallagher's testimony regarding the field admonishment and identification was as follows:

A. I walked back to the care where Sorensen was at, and talked to -- basically told me he had one of the witnesses for -- to the accident there. And I -- from memory went over what we call the field admonishment. Basically I can sort of recall from my report what I said to her.

I advised her that we had a subject contained, and it may not be the person involved in the accident at 148 San Rafael. I explained that the person was handcuffed and that's for officer safety reasons and it's no indication of guilt or innocence.

I explained that she needed to look at the subject's facial features and try to compose what she remembered -- compare that to what she remembered when she saw it happening. And I told her that she was under no obligation to pick the subject, that she should take her time and make a decision. And I asked her if she had any questions in regards to this, and she told me no.

Q. Okay, So then what happened?

A. Officer Sorensen pulled forward. *****

Pulled forward and at which point we used the spotlights on the patrol cars to illuminate the area he was standing at.

Q. Could we put that Officer Sorensen -- could you -- could you demonstrate where officer Sorensen moved his car to?

A. He moved it up into this area. What might have been blocking, and I'm trying to remember if that's correct or not, would be a Parr Lumber delivery truck or something like that. I don't recall exactly, but I remember there was something there (indiscernible).

Q. Now, they've pulled the car up. How close -- how far away is -- is Ms. McReynolds now from [Petitioner]?

A. Well, I had paced off and it's about 24 feet.

Q. Okay. So she's 24 feet away and it's what, is he in

5 - OPINION AND ORDER -

the back seat of the car or they pulled him out of the
car or what?

A. He's in the back seat of the car, it was pointing
(indiscernible) had him step out of the car.

Q. Okay.

A. And face the patrol car.

Q. And what was -- what's happened? What how did Ms.
McReynolds respond at that point?

A. She looked at him for a couple seconds, and have him
turn so she could see his side view of him. She looked
again for three to four seconds and said, "I think that's
him." And then she went on to say, "No. I'm pretty sure
that's him." Those are direct quotes from her. Then she
went on to say that, "He may not have the coat on, but
the profile is him. He has the same fat cheeks."

Q. Then what happened? So she's -- she's saying that
she's maybe, she's pretty sure, she may be sure, she
thinks that's him, he's not wearing the clothes that he
was wearing 20 minutes earlier.

A. She started -- started out saying, "I think that's
him," and she said, "No. I'm pretty sure that's him."

Q. And then -- and then what happened?

A. At which point he was put back in the car.

(Tr. Vol. 2 at 27-29.)  With respect to the truck identification,

Officer Gallagher testified:

A. [Sorensen] pulled forward more so he -- from out of
the patrol car she would be able to see the truck. Where
she was at back here, we were not able to see the truck
where it was parked at.

Q. Okay. Let's -- I need to get a real clear picture of
that.

A. Okay. Like I said, I don't remember exactly where the
-- his truck was parked at in the parking lot, which
angle it was at. If I recall correctly, it was up towards
the front of the store. So from this angle where he was

at, like I said, there was something blocking that view
up to where the truck was at, and I don't recall what it
was at that time. May have been a Parr Lumber delivery
truck or something that was there that was actually
blocking the view where his truck was at, so she was not
able to see his truck. At which point after we did the
show-up of Mr. Diaz, Officer Sorensen pulled forward
several more feet to where she had a view of the truck.
And when she saw that --

Q. How did she respond to the truck?

A. She immediately said, "That's it," in reference to the
car that just did the hit and run.

Q. So she identified the truck. And what I'm unclear
about is -- is did he pull up two different times or did
he pull up just one time?

A. He pulled once to do the show-up, and he pulled up a
little bit further to do the -- to basically allow a view
of the truck.

(*Id.* at 29-30.)  Officer Gallagher also testified that there was no
formal classroom training on how to do show-ups, or Bureau policies
that he was aware of, but that he had been through numerous show-
ups and he'd had detectives explain how they were done.  (*Id.* at
31.)

On the State's cross-examination, Officer Gallagher testified
that the original calls were received at 8:59 p.m.; that Petitioner
was stopped at approximately 9:30 p.m.; that McReynolds was
transported to where Petitioner was detained within approximately
10-15 minutes of the traffic stop; that he did not speak with
McReynolds prior to giving her the field admonishment; that he
remained with McReynolds during the show-up and was never with
Petitioner during that process.  (*Id.* at 31-32.)  He also confirmed

his prior testimony regarding giving McReynolds the admonishment; that she did not have any questions; that he was never with the defendant during the show-up; and that the subject was 24 feet away from McReynolds and well illuminated by the spotlights.  (*Id.* at 32-33.)  With respect to McReynolds statements during the show-up, he reiterated that "after looking at the defendant for a couple of seconds, she asked to have him turn his face so she could see his left side," and testified:

> Q. Did she actually speak directly to the defendant, or was that information?
>
> A. She had asked me to have him turn.
>
> Q. Okay.
>
> A. So she could see him.
>
> Q. All right. And -- and were you -- did she explain to you why it was that she wanted him to turn to the side in order to look at him from that angle?
>
> A. I don't recall a direct quote from her, or anything like that. But my recollection is that she said that's the side she saw when she witnessed him drive.
>
> Q. All right. And then you testified that Officer Sorensen then pulled forward after she made her identification, it was at that time that she was able to see the truck and she identified that?
>
> A. That is correct.
>
> Q. Prior to her identification of the defendant, to your knowledge, was Ms. McReynolds ever in view of the truck at -- prior to the identification?
>
> A. Not to my knowledge, no.

(*Id.* at 33-34.)

8 - OPINION AND ORDER -

Officer Sorensen testified that he was a Portland Police Officer and on the fatal crash team; that he was dispatched to the hit-and-run location to interview witnesses; and that he transported witness McReynolds to where a suspect had been detained. (Tr. Vol. 2 at 36-37.) With respect to his interview of McReynolds prior to transporting her, he testified:

> Q. And what did she tell you about what it was she had seen?
>
> A. She said that she saw a car coming up behind her going southbound on 148th approaching Glisan, and she said she saw a bike under the vehicle, said it was making lots of sparks, and she said it didn't seem right so she called the police.
>
> Q. All right. And did she give you a description of the vehicle that she saw coming up behind her?
>
> A. Yeah. She said it was an older style pickup truck, said it had a broken windshield, said it was dirty-looking, and she figured it was a '70s or early '80s pickup truck.
>
> Q. Okay. At some point did the truck pass her or was she able to get a look at the driver in the vehicle?
>
> A. Yes.
>
> Q. All right. And how did she describe the driver of the vehicle?
>
> A. She described him as a either a light-skinned black male or Hispanic in his 40s to 50s, chubby cheeks, short hair and kind of a little heavyset looking.
>
> Q. Okay. And after she gave you this brief description, did she agree to go to the location -- or to a different location to see if she could identify a suspect?
>
> A. Yes.

(Tr. Vol. 2, at 38-39.) With respect to the show-up he testified:

Q. All right. And were you present on Southeast Stark when Officer Gallagher met you and Ms. McReynolds at your patrol car?

A. Yes.

Q. Okay. And at the time that he first "he" being Officer Gallagher -- met you at your patrol car, were -- how far away were you from the parking lot, approximately?

A. Let's see, we were -- we were on the curb of the road. I would say somewhere between 15 and 20 feet maybe.

Q. Okay.

A. I'm just guessing.

Q. All right. So at the time that he first made contact, you hadn't pulled in or up to the parking lot, you hadn't gotten that far?

A. No, we had not.

Q. All right. And when you were initially contacted or greeted by Officer Gallagher, could you see the defendant at that time?

A. I don't recall if we saw him right at that particular time.

Q. Okay. And did you hear Officer Gallagher speak briefly with Ms. McReynolds?

A. Yes, I did.

Q. All right. What do you recall their conversation being about?

A. He said that, you know, we have this guy stopped. He's in handcuffs. We put him in handcuffs for officer safety reasons. This does not necessarily mean that he is a in -- he is not -- he is not under arrest for anything. And just because we have him stopped, it does not mean that he's guilty of this. We just want to see if this is a person that you could identify as the -- as the person you saw. Basically gave her instructions about, you know, that -- you know, let it know that just because we have him stopped and in handcuffs does not mean that he's the suspect or that -- or under arrest --

10 - OPINION AND ORDER -

Q. Okay.

A. --in this case.

Q. Did she seem to understand what he was saying?

A. Yes.

Q. Okay. And then after he gave her this brief admonishment, as you call it, do you recall pulling your patrol car forward so that she could view the defendant?

A. Yes.

Q. Okay. And do you remember if the defendant was, in fact, in handcuffs?

A. Yes, he was.

Q. Okay. And do you remember if you illuminated him with your spotlight or how he was --

A. I -- I know I used by spotlight. It seems like there was two spotlights used.

Q. Okay. All right. And from your vantage point being seated in the patrol car next to Ms. McReynolds, were you able to clearly see the defendant?

A. Yes.

* * * * *

Q. All right. And did you hear Ms. McReynolds' reaction to having seen him?

A. Yes.

Q. All right. And did she recognize him?

A. She told me that -- she goes, "That looks like him. I think that's probably him," is the words she used.

Q. Okay. And do you remember, you indicate in your report that at some point she had him turn to the left?

A. Yes.

Q. Okay. I don't see in your report, "I think that's

probably him." Did you -- you didn't quote her on that?

A. She said that she was pretty sure that was him, is what she told me.

Q. Okay. And then she made comment about his chubby cheeks as well, did she not?

A. Yes, she did.

Q. Okay. And at the time that he was illuminated, he was -- was he wearing a blue jacket?

A. Yes, he was.

Q. Okay. And did she say -- did she make a comment about the blue jacket?

A. She just says, "I don't remember the blue jacket."

Q. Okay. And after that identification was made, do you recall her ever making a comment after that about recognizing the truck, the suspect's vehicle?

A. Yes. She definitely identified that as the truck she saw.

Q. Okay. Did that happen before she was able to see the defendant or after she was able to see the defendant?

A. She probably saw the truck at about the same time because the truck was pulled into that same driveway facing in.

Q. Uh-huh.

A. So I think she fully saw a good view of the truck when we pulled into the parking lot.

Q. Okay. So you actually pulled into the parking lot?

A. After -- after we had talked to Gallagher, we actually turned the car facing into the parking lot.

(Tr. Vol. 2 at 39-43.)  On cross-examination, Sorensen testified:

Q. She she -- did you talk to her on the way over there about, you know, what -- what she saw?

A. I don't -- I don't remember talking to her about this scene on the way there. I interviewed her at up in the area of 148th and San Rafael.

Q. Right.

A. And I don't remember really talking to her about, you know, what she would be expected to see here or any of that. I remember we talked about her -- she was nervous and small talk.

Q. Right. But I mean, she -- she had indicated to you that she had just seen this driver of this vehicle from the side, right?

A. Yes.

Q. I mean, that was the really import of her identification is that she had seen the guy from the side?

A. Yeah. She saw him from the left side.

Q. Because she was parked a couple lanes over in the left-hand turn lane?

A. Right.

Q. There at 148th and Glisan?

A. Correct.

Q. And then -- and then the driver of the vehicle was a couple lanes over in the right-hand lane?

A. Yes.

Q. And at that point, just for the record, there was three lanes of traffic, the turn lane she was in, the middle lane or the left-hand lane --

A. Right. Right.

Q. --and then the right-hand lane?

A. So there was one lane that separated them.

Q. So when you pulled into the parking lot to to do the show-up and you illuminated him, you know, you could see

13 - OPINION AND ORDER -

the truck?

A. Yes.

Q. And -- and it was then at that point that they illuminate him, and her initial reaction when he was pulled out of the car, they showed him straight up, right? Face--

A. Yes.

Q. Face first right to the witness?

A. Yes.

*****

Q. And -- and she wasn't comfortable with that view because she hadn't seen that view?

A. Well, she said that -- I -- the best -- "My best view of him was from the left," and so we had him turn to the left, see the left side.

Q. So then he turned to the left.

A. Right.

Q. And -- and that's when she made her remark that she was pretty sure that that was the person?

A. Yes.

Q. And she also identified the truck?

A. She knew that that was the truck, that was definitely the truck, yes.

Q. Before she said it was pretty sure?

A. No. I think we dealt with the person first before we said anything about the truck.

Q. Okay. Now -- oh, it was -- it was -- it was dark by that time, right?

A. Yes.

(Tr. Vol. 2 at 44-46.)

14 - OPINION AND ORDER -

McReynolds testified that on June 19, 2003, she was driving on NE 148th between 8:30 and 9:00 p.m. and that it "was getting dusky." (*Id.* at 48.)   She then testified:

> A. I was headed south on 100 -- Northeast 148th Avenue, and I was approaching a stop light at Glisan. And I just happened to glance in my rear-view mirror, and saw a car approaching on -- from behind me, and there were sparks shooting out of it, so I was kind of like, you know, interested in what's going on. And as it got closer I was able to tell that it was a bike that was attached to the passenger side of the truck, and that the windshield was smashed. And so I got myself out of the way by turning into the left turn lane because I didn't want to get hit or -- you know, I didn't know what was going on. And so I looked at the truck and called in the license plate number.
>
> Q. Okay. Now, you say that the -- you noticed that the windshield was smashed. Could you see which side or where on the windshield it was smashed?
>
> A. Yeah. It was the passenger side.
>
> Q. Okay. And so as the truck -- as you saw the truck approaching you in your rear-view mirror, was it directly behind you in your lane?
>
> A. No. It wasn't in my lane. There were two lanes to go -- there was one lane to turn to right and a middle lane and a left lane.
>
> Q. Okay.
>
> A. And when I first saw the truck, I was in the middle lane to go straight through the light.
>
> Q. Uh-huh.
>
> A. But I moved over to the left turn lane because I didn't know why this truck was sparking or -- I just wanted to get out of the way.
>
> Q. All right. And so as the truck -- as you pulled into the left-hand turn lane, where -- where did the truck go?
>
> A. He came up in the right lane.

Q. All right.

A. And and approached the light.

Q. Okay. And at the time -- now, what were you doing as you -- as you pull into the left lane and the truck is coming up alongside of you?

A. I was looking at the truck.

Q. Okay. Did you also look at the driver?

A. Yeah. I saw the driver.

Q. Okay. And what was the driver doing?

A. Well, he was looking straight ahead, and kind of slowed at the light and turned right.

Q. Okay. Did he at any point look at you?

A. No.

Q. All right. And could you estimate the distance between you and the driver at the time that you he came up along side of you?

A. Maybe 15 feet.

Q. Okay. And now, you gave a description to police. What is it that you remember about the driver? I know it's been some time, but to the extent you remember now.

A. I remember that he had dark hair. It was a man.

Q. Okay.

A. And colored skin, so either -- I thought maybe he was either Hispanic or light African-American.

Q. Okay.

A. And that he had kind of chubby cheeks. I only saw his left side.

Q. Uh-huh.

A. And a mustache.

16 - OPINION AND ORDER -

Q. All right. And after the truck made that right-hand turn, were you able to see the license plate?

A. I actually saw it before he turned.

Q. Oh, okay.

A. I -- yeah. I kind of did a quick glance of the whole thing, and then focused in on the truck model and -- or, you know, the manufacturer and the license plate.

Q. So you were paying a lot of attention to the truck that's sparking?

A. Uh-huh.

*****

A. Because I wanted to call it in.

Q. Right. All right. And did you relay the license plate information to police?

A. Yeah.

Q. All right. And after that, so the last what was -- where was the last point you saw the truck? Which direction was it headed?

A. It headed west on Glisan.

*****

Q. Okay. From your vantage point there in your car, did you notice anyone else inside the truck other than the driver?

A. No.

*****

Q. Okay. And now, by the time you were transported to that other location, do you remember if it was dark yet?

A. It was dark by the time I was transported, yes.

Q. Okay. And do you remember the police officer or any police officer talking to you about the fact that you were going to see someone?

17 - OPINION AND ORDER -

A. Yes.

Q. Okay. All right. And at the time did you immediately upon arriving at this location see someone that they had there for you to -- did they present him immediately to you, or did you speak to police first?

A. I think someone just came up and said that I was there to identify this person and --

Q. Okay. And--

A. That he couldn't see me, yeah.

Q. Okay. And do you remember if the man they showed you was in handcuffs?

A. I -- I think he -- yeah.

Q. Okay. And did they have him -- was he already out in the open, or did they have him get out of a vehicle?

A. I think he was already out.

Q. All right. And do you recall if there was anything familiar about that man?

A. Yeah. I -- I had -- I had them ask him to turn with his left side towards me, and I recognized his full cheeks and mustache --

Q. Okay.

A.-- and dark hair, yeah.

Q. Okay. So you recognized his profile --

A. Yeah.

Q.-- which was the same vantage point you had when you saw him earlier?

A. Yeah.

Q. Okay. And after that do you recall seeing a vehicle that looked familiar to you?

A. Yeah.

18 - OPINION AND ORDER -

Q. Okay. And how is it that you were able to see the vehicle?

A. It was it was like a parking lot --

Q. Uh-huh.

A. -- on Stark, and the -- and the vehicle was kind of behind where he was standing.

Q. Okay.

A. And the police. So it was still there.

Q. Okay. And do you recall telling the police that's it, that's the vehicle?

A. Yes.

Q. Okay. And did you have any doubt about whether or not that was the same vehicle you had seen?

A. No.

Q. Okay. And do you remember if you looked at this vehicle from -- were you seeing the front of it or the back of it, do you recall?

A. I think that I was seeing the back of it there.

Q. Okay. All right. And do you remember if you saw the vehicle before you saw the man they had you identify or after?

A. I think after.

Q. Okay. And, Ms. McReynolds, the man that you saw driving with the -- the bike stuck to the front of the vehicle, do you see -- do you recognize if that person is present in the courtroom today?

A. Yes.

Q. Okay. And can you point him out for the judge?

A. He's right there in the middle at that table.

THE COURT: Yep.

Q. Does he look substantially the same to you today that
he did -- that you have in your memory from the night
that you saw the bike with the sparks?

A. Does he look that same?

Q. Yes.

A. Yes.

Q. Okay. And when you were shown the suspect at this --
at 186th and Stark after the vehicle had been stopped, do
you recall the police illuminating the suspect with
spotlights?

A. Yes.

Q. Okay. Did you have any problem in seeing him or was it
too dark for you or --

A. No. The lights were helpful.

(Tr. Vol. 2 at 48-56.)  On cross-examination, McReynolds testified:

Q. Can you recall the length of time that you had to make
the observation? You know, you said you were about 15
feet away at 148th and Glisan.

A. Oh. It was probably about, you know, ten seconds from
the time I saw him approaching to turning.

Q. Okay. And did he just turn? I mean, was he on the
move? It was hard to tell from your --

A. Yeah.

Q. He just went past you and turned?

A. Yeah. But he was slowing down because there was a red
light there.

Q. He was going ten, twenty miles an hour, ten, fifteen
miles an hour about?

A. Yeah.

Q. And he just kind of rolled past you, you were in the
left-hand, so it was a fairly brief, you know,
observation. Is that a fair statement?

A. Yes.

Q. And about do -- so it was -- what was the angle? Was it just a straight shot?

A. Yeah. There wasn't a car in front -- you know, in between us.

Q. The angle of your observation?

A. Well, I was looking to my right.

Q. And what had you been doing prior to that?

A. I was over at my mom's house watering her yard.

Q. Okay. Had you worked that day or --

A. No.

Q. Now, at -- this was at about 9:00 roughly?

A. Uh-huh.

*****

Q. And you remembered -- you spoke to a number of officers about this on a number of occasions?

A. Right.

Q. You're -- do you remember telling Officer Lish (phonetic) or the 9-1-1 operator that the person had glasses?

A. Yeah. I remember saying that because I -- I couldn't remember if he did or not. When I called in.

Q. Yeah.

A. I thought that he may have had glasses on.

Q. Okay. You thought the person had glasses?  And then you had a second conversation with Officer Sorensen, who transported you to the scene?

A. Uh-huh.

Q. What did you talk about there?

21 - OPINION AND ORDER -

A. At the scene or --

Q. On the way there?

A. We talked about what I do and, you know, chatting.

Q. Did you talk about what was going to happen at the location?

A. Oh, yeah. He said that I'd be shown somebody and asked if -- if that was the person I saw driving.

Q. Okay. When you got to the scene, the you -- you met Officer Gallagher, right? Or another police officer.

A. Yeah.

Q. Okay. And do you remember what he told you about the procedure?

A. That -- I think, you know, I'd be looking at somebody and identifying if that was the person I saw driving.

Q. Okay. And so when they pulled up to this parking lot or pulled into the parking lot and shined the light on this person --

A. Uh-huh.

Q. -- who was my client at that point in the parking lot, you weren't able to -- when they showed him, they showed him face -- face forward, right?

A. Right.

Q. And you didn't -- you couldn't identify him on that?

A. No.

Q. Because you hadn't seen him on that?

A. Right. I had not seen him from the front.

Q. And then you asked them -- and then -- and the and the truck is just in the background, right?

A. Yeah.

Q. It's right behind -- I think you testified it was

right -- the truck was right behind him?

A. Yeah.

Q. And so let's make it clear, when he's standing there and they're shooting a spotlight on it, is some of the light going to the truck behind him?

A. Well, I was paying attention to the man. I -- you know, I didn't notice the truck was there until after I had seen him.

Q. Okay. Now, did -- what did -- what did you say after you saw the truck?

A. I think I said that's the truck that I saw.

Q. Do you remember exactly what Officer excuse me. Do you remember talking to another officer later on another day a week later?

A. Yeah. But I had a few phone calls, and people calling me for a while.

Q. And you testified that he had dark hair.

A. Yes.

*****

Q. And you never -- you never described a person that had bleached blond hair?

A. No.

Q. And the driver -- from what you saw, the driver didn't have bleached blond hair?

A. Right.

Q. And -- and were you in a position to observe that if the person's hair was bleached blond?

A. Yeah.

Q. Okay. And, in fact, Officer Hosely called you back -- another police officer or someone, and asked you about that, right?

A. Yeah.

Q. And you told them, "I didn't see anybody with bleached blond hair"?

A. Right.

Q. And -- okay. And the person also didn't have on -- do you remember what kind of clothing the person had on?

A. Well, I only saw like his shoulder, so I think that he had a jacket on, like a -- like a -- probably a I don't know what to call it. You know those jackets with like a rim collar?

Q. Well, I mean, there was -- there was -- the person that was -- that was shown to you by the police at 186th and Stark --

A. Uh-huh.

Q.-- had a blue jacket on.

A. Okay.

Q. But you didn't remember that -- that being part of the description of the person driving the truck?

A. I don't think so. I mean, I didn't really see much of his body, so I -- when he was driving by, so I don't know what he was wearing.

Q. But did you -- do you remember telling the officers that you didn't remember the blue jacket?

A. Yeah.

Q. Why would you have said that?

A. I just didn't remember it at that time.

Q. Okay. Any other discussions? I -- I've talked to you about four different people you talked to, the initial person you talked to followed up on the 9-1-1 call, Officer Sorensen, who transported you to the scene, Officer Gallagher, who sort of conducted the show-up --

A. Uh-huh.

24 - OPINION AND ORDER -

Q. -- and then another officer contacted you later. Did
you talk to any other police officers about this?

A. I remember Officer Bosely at some point. I remember
his name. I think he called me probably somewhere within
a month of that occurring.

Q. What -- what was the sum and substance of that
conversation?

A. I think just to say what I had seen again and --

*****

Q. All right. Are you -- I want to make just absolutely
clear, when you pulled into that parking lot, you didn't
see the truck right away?

A. No.

Q. Did that -- did it reinforce your belief when you saw
the truck?

A. My belief in what?

Q. That -- that you were pretty sure that the person you
were observing was the driver?

A. Well, sure it reinforced it. But I saw him first and
saw his profile first.

(Tr. Vol. 3 at 56-63.)  On re-direct, McReynolds testified:

Q. When you arrived there at 186th and Stark and they
asked you to see if you recognized a person that they had
detained, the person that they showed you, who we know is
the defendant, do you remember him having blond hair?

A. When I pulled up?

Q. Yeah.

A. I -- when he looked at me from the front, the at that
time I couldn't tell that was him because I had seen his
left side when he drove by.

Q. Uh-huh.

A. I saw dark hair, and he probably had like some little

25 - OPINION AND ORDER -

streaks of a lighter color.

(Tr. Vol. 2 at 64.)

Officer Busse testified he was one of the primary officers
assigned to investigate the hit-and-run, and that he returned to NE
148th and San Rafael the following night to be at the scene at the
same time the calls had been received; that city street lights had
not yet come on; that he was parked in front of a house at 9:06
p.m. and could read the house number on the porch without lighting,
from approximately 40 feet.  The Court took judicial notice that
the sun was up at the time of the incident, and that the sunset in
Portland, Oregon on June 19, 2003, was 9:03 p.m.  (Tr. Vol. 2, 67-
69.)

Following the testimony, counsel argued his client's right to
counsel at show-up was violated; and the show-up procedure was
unduly suggestive.  He pointed to Officer Sorensen testimony that
the officer saw the truck behind the defendant during the show-up,
even though McReynold's recollection was that she didn't see truck,
and therefore the in-court identification was contaminated by the
show-up procedure.  The State argued that Officer Gallagher
testified the truck not visible and that Officer Sorensen had moved
his patrol car twice to allow separate viewing of the subject and
the truck; that McReynolds testified she didn't see truck and that
she recognized Petitioner's profile; and that Petitioner had no
right to counsel since he was simply detained and not under arrest.
The court denied Petitioner's motion to suppress, finding that the

26 - OPINION AND ORDER -

officers had been careful and that there was nothing unduly suggestive; and that the identification would be subject to cross-examination.  (Tr. Vol. 2, at 72-73.)

Petitioner proceeded to a jury trial, at which he testified. His defense was that an acquaintance, Fernando, was driving his truck when the cyclist was hit.  The jury found Petitioner guilty of first-degree manslaughter, failing to perform the duties of a driver, and driving while under the influence of intoxicants.  He was sentenced under Measure 11 to ten (10) years imprisonment on the manslaughter conviction.  He received concurrent terms of imprisonment on the other convictions.

Petitioner directly appealed his conviction, arguing that admission of McReynolds' identification testimony violated his due process rights because the field identification was improperly suggestive.  The Oregon Court of Appeals affirmed without opinion, and the Oregon Supreme Court denied review.  (Resp. Exs. 108, 107.)

Petitioner filed for post-conviction relief ("PCR") alleging ineffective assistance of trial counsel.  However, the PCR trial court denied relief. (Resp. Exs. 119-121).  Petitioner appealed, but the Oregon Court of Appeals affirmed without opinion, and the Oregon Supreme Court denied review.  (Resp. Ex. 127, 126.)

## DISCUSSION

Petitioner alleges that his convictions were obtained in violation of his right to due process under the Fourteenth Amendment when the trial court denied his motion to suppress an

27 - OPINION AND ORDER -

eyewitness identification that was unnecessarily and unduly suggestive. Petitioner argues for *de novo* review on the basis that "the trial court's decision was contrary to clearly established Supreme Court Law, was an unreasonable application of that law, and was based on an unreasonable determination of the facts." (#32, Brief at 14.)

Respondent argues the state court decision is entitled to deference under § 2254; that the trial court's decision was neither contrary to nor an unreasonable application of established federal law; and that the trial court's decision was not based on an unreasonable finding of a material fact. Respondent also argues that even if the field identification was unnecessary and suggestive, it was sufficiently reliable to outweigh any suggestive effect and it did not have a substantial and injurious effect on the jury. (#34, at 12-15.)

I.   <u>Standards</u>

Under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA),

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim-
>
> > (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law as determined by the Supreme Court of the United States; or
> >
> > 2) resulted in a decision that was based on an

28 - OPINION AND ORDER -

> unreasonable determination of the facts in
> light of the evidence presented in the State
> court proceeding.

28 U.S.C. § 2254(d).   The Supreme Court construed this provision

in *Williams v. Taylor*, 529 U.S. 362, 386 (2000), stating: "it seems

clear that Congress intended federal judges to attend with the

utmost care to state court decisions, including all of the reasons

supporting their decisions, before concluding that those

proceedings were infected by constitutional error sufficiently

serious to warrant the issuance of the writ."   "We all agree that

state court judgments must be upheld unless, after the closest

examination of the state court judgment, a federal court is firmly

convinced that a federal constitutional right has been violated."

*Id.* at 389.   In *Harrington* v. *Richter*, 131 S.Ct. 770, 786-87

(2011), the Supreme Court reiterated the deference owed to State

court determinations, stating: "[a]s a condition for obtaining

habeas corpus from a federal court, a state prisoner must show that

the state court's ruling on the claim being presented in federal

court was so lacking in justification that there was an error well

understood and comprehended in existing law beyond any possibility

for fairminded disagreement."

    (1)  Contrary to, or unreasonable application of clearly
established Federal law

    "'Clearly established Federal law' is the governing legal

principle or principles set forth by the Supreme Court at the time

the state court renders its decision."   *Lambert v. Blodgett*, 393

F.3d 943, 974 (9th Cir. 2004) cert. denied, 126 S. Ct. 484 (2005).
A state court decision is "contrary to" clearly established Federal
law if it is "in conflict with", "opposite to" or "diametrically
different from" Supreme Court precedent. *Williams,* 529 U.S. at
388.

An "unreasonable application" of clearly established Supreme
Court law occurs when "the state court identifies the correct
governing legal principle [ ] but unreasonably applies that
principle to the facts of the [ ] case." *Lambert* at 974 (citing
*Williams.*)    The state court's application of law must be
*objectively unreasonable.* *Id.* (emphasis added). "Under §2254(d)'s
'unreasonable application' clause, a federal habeas court may not
issue the writ simply because that court concludes in its
independent judgment that the state court decision applied [the
law] incorrectly.   Rather, it is the habeas applicant's burden to
show that the state court applied [the law] to the facts of his
case in an objectively unreasonable manner.   An *unreasonable*
application of federal law is different from an *incorrect*
application of federal law." *Woodford v. Visciotti,* 537 U.S. 19,
24,25 (2002), rehearing denied, 537 U.S. 1149 (2003), (internal
citations omitted).

(2) Unreasonable determination of the Facts

In reviewing state court decisions, "a federal court may not
second-guess a state court's fact-finding process unless, after

review of the state-court record, it determines that the state
court was not merely wrong, but actually unreasonable." *Taylor v.
Maddox*, 366 F. 3d 992, 999 (9th Cir. 2004). This is a standard
that will be met in few cases. *Id.* at 1000. An unreasonable
determination of the facts occurs when the fact-finding process is
flawed. Examples of a flawed process include: making evidentiary
findings without holding a hearing, misstating the record, ignoring
the record, misapprehending the evidence presented. *Id.* at 1001.
"A state-court factual determination is not unreasonable merely
because the federal habeas court would have reached a different
conclusion in the first instance." *Cullen v. Pinholster*, 131 S.Ct.
1388, 1411 (2011).

     The last reasoned decision by the state court is the basis for
review by the federal court. *See Ylst v. Nunnemaker*, 501 U.S. 797,
803-04 (1991); *Franklin v. Johnson*, 290 F.3d 1223, 1233 n. 3 (9th
Cir. 2002). In this action, the Court is reviewing the decision of
the trial court, which was affirmed on appeal without the issuance
of a written opinion.

II.  Applicable Law

     The Due Process Clause protects against the use of evidence
that is "so extremely unfair that its admission violates
fundamental conceptions of justice." *Dowling v. United States*, 493
U.S. 342, 352 (1990). An eyewitness identification is tainted and
raises due process concerns if, under the totality of the

circumstances, suggestive law enforcement procedures make it "all but inevitable" that a witness will identify a subject, whether or not the subject was in fact who the witness saw, thereby severely undermining the reliability of the identification. *Foster v. California*, 394 U.S. 440, 443 (1969). Even if identification procedures are tainted, "suppression of the resulting identification is not the inevitable consequence." *Perry v. New Hampshire*, 132 S.Ct. 716, 724 (2012)(citing *Manson v. Braithwaite*, 432 U.S. 98, 12-113 (1977) and *Neil v. Biggers*, 409 U.S. 188, 198-99 (1972)). Rather,

> the trial judge must screen the evidence for reliability pretrial. If there is "a very substantial likelihood of irreparable misidentification," *Simmons v. United States,* 390 U.S. 377, 384,[ ](1968), the judge must disallow presentation of the evidence at trial. But if the indicia of reliability are strong enough to outweigh the corrupting effect of the police-arranged suggestive circumstances, the identification evidence ordinarily will be admitted, and the jury will ultimately determine its worth.

*Id*. at 720. In sum, a trial court must look at the totality of the circumstances surrounding a challenged identification and weigh the reliability of the witness's identification against any corrupting effect of law enforcement's identification procedures. *Perry*, 132 S.Ct. at 725 (discussing holdings in *Neil v. Biggers*, 409 U.S. 188 (1972), and *Manson v. Brathwaite*, 432 U.S. 98 (1977)). "Where the 'indicators of [a witness'] ability to make an accurate identification' are 'outweighed by the corrupting effect' of law enforcement suggestion, the identification should be suppressed."

*Id.* (quoting *Brathwaite*, 432 U.S. at 114). But, "[i]f the indicia of reliability are strong enough to outweigh the corrupting effect of the police-arranged suggestive circumstances, the identification evidence ordinarily will be admitted." *Id.*, at 720 (discussing *Simmons*).

When faced with a tainted identification procedure, "reliability is the linchpin in determining the admissibility of identification testimony...." *Brathwaite*, 432 U.S. at 114. The factors a court should consider in assessing the reliability of the identification include:

> - the opportunity of the witness to view the criminal at the time of the crime[;]
>
> - the witness' degree of attention[;]
>
> - the accuracy of the witness' prior description of the criminal[;]
>
> - the level of certainty demonstrated by the witness at the confrontation[;] and
>
> - the length of time between the crime and the confrontation.

*Biggers*, 409 U.S. at 199-200. Care must be taken in making a determination on the reliability and admissibility of a witness identification that other evidence of guilt, if present, not taint the process. *See Brathwaite*, 432 U.S. at 118 (Stevens, J. concurring).

/ / /

/ / /

III. <u>Analysis</u>

The state court denied Petitioner's pre-trial motion to suppress witness McReynolds' identification finding that the identification procedures were not unduly suggestive. The court stated:

> There have been a number of cases, of course, over the years on show-ups and scene identifications, and that has led to the police force being a little extra careful and going through an admonishment format to make sure that any suggestive, or overly suggestive I guess, elements don't get into the actual identification.
>
> And I think both police officers here adhered to that. Both of the police officers I think are on the fatal -- fatal scene team, which means they actually teach this sort of thing to the other officers who might be involved.
>
> I don't find anything unduly suggestive in this case. It is pretty much a standard run of the mill. This was not a -- defined as a critical stage of the criminal proceedings where the defendant would be entitled to counsel. He was not under arrest, as the officers said at that point. He was in handcuffs for officer safety.
>
> And in any event, that's been run up the flagpole a couple of times and decided that this is not that point at which he's entitled to have counsel. So the motion to suppress the identification is denied.
>
> Anything else on that issue goes to the weight of the identification, which, of course, would be subject to cross-examination at trial.

(Tr. Vol. 2, at 72-73.)

Petitioner argues the trial court's finding that the identification was not suggestive was based on a factual error - the court's belief that the field admonishment was given by members of the fatal scene team who taught other officers identification procedures - and, thus, *de novo* review is warranted. (#38, at 1-2.) Petitioner also contends the admonishment did not cure the

suggestive nature of the identification but instead increased the suggestiveness. (*Id.*)

Petitioner's argument for *de novo* review implies that the trial court made its findings without regard to the testimony presented at the suppression hearing. The court's ruling, however, shows that was not the case. In denying Petitioner's motion, the trial court noted that case law regarding admonishments and suggestive elements had "led to the police force being a little extra careful" during such procedures. The court found the officers had adhered to that extra level of care in Petitioner's case, clearly indicating the court evaluated the officers conduct from the testimony. The finding that the show-up procedures were not unduly suggestive also reflects the court's assessment of the testimony. And although the trial court stated it believed both officers were members of the fatal scene team and taught other officers about identification procedures, the court's statement was not material to its assessment that extra care was used, as case law mandates for identification procedures. Nor was it material to the court's finding that the procedures were not unduly suggestive.[4]

The Court finds the suppression hearing findings are not

---

[4]The Court notes that the trial court was not entirely in error since Officer Sorensen testified he was a member of the fatal scene team (Tr. Vol. 2 at 36); and Officer Gallagher testified detectives taught him identification procedures and that he had been through numerous show-ups (Vol. 2 at 31).

unreasonable. *C.f. Taylor v. Maddox*, 366 F.3d 992, 999 (9th Cir. 2004)(misapprehension as to a material factual issue may render a court's factual finding unreasonable). Accordingly, they are presumed to be correct and are entitled to deference. And based on the trial court's finding that the show-up was not unduly suggestive, it was neither contrary to nor an unreasonable application of established federal law for the court to deny Petitioner's motion to suppress.[5] Habeas relief is, therefore, not warranted.

Even if the Court did not give deference to the trial court's findings, the record shows the show-up procedures did not lead to a very substantial likelihood of irreparable misidentification. Testimony at the suppression hearing shows: Officer Sorensen did not engage McReynolds in substantive conversation while he transported her to the show-up; Petitioner was not visible until after McReynolds received the admonishment; the officers advised McReynolds that the subject *may or may not be the person she had seen* and that the handcuffs were purely precautionary and not an indication of guilt; McReynolds confirmed that she understood that the person she was going to view *may or may not be* the driver she had seen; and McReynolds' identification of Petitioner was separate

---

[5]Had the trial court found the show-up procedures to be unduly suggestive or otherwise tainted, it would have been necessary for the court to weigh the reliability of McReynolds' identification against the corrupting effects of the procedures. *See Perry*, 132 S.Ct. at 716.

and preceded her identification of the truck.  More fundamentally, McReynolds' request at the show-up that the subject turn so she could see him from the same angle as she had viewed the driver reveals that she was going to base any identification on seeing characteristics that she had noted in the driver's profile. Furthermore, her comments in making the identification reveal that her identification was based on her seeing chubby cheeks, a mustache, dark hair, and a Hispanic or light African-American complexion - the same characteristics she had described to Officer Sorensen prior to the show-up.  Further evidence that McReynolds based her identification on characteristics she recognized, and not the show-up procedures, is that she did not hesitate to tell the officers that she did not recognize the blue jacket the subject was wearing.  The Court found nothing in the record to suggest McReynolds' identification was influenced by the officers or the procedures used, or that she was not credible when she stated she was focused on the subject she was viewing and did not see the truck until after making the identification of the driver.

Based on the suppression hearing record, the Court concludes the trial court's assessment of the show-up procedures, and not its erroneous belief that both officers were members of the fatal scene team, led to the trial court denying Petitioner's motion to suppress.  Furthermore, the Court concludes that the show-up did not make it inevitable that McReynolds would identify the detained subject as the driver she had seen, or create a substantial

37 - OPINION AND ORDER -

likelihood of misidentification because, to a significant degree, McReynolds directed the identification process. Therefore, it was neither contrary to nor an unreasonable application of established law for the trial court to deny the motion to suppress, and habeas relief is not warranted.

Finally, even if the Court assumes it was error for McReynolds' identification to be admitted, the Court concludes the error was harmless and, accordingly, Petitioner is not entitled to relief.

Under *Fry v. Pliler*, 551 U.S. 112, 121-22 (2007), where a constitutional error is found, a court must assess the prejudicial impact of the error before granting habeas relief. Unless the error had a "substantial and injurious effect or influence in determining the jury's verdict," habeas relief is not warranted. *Brecht v. Abrahamson*, 507 U.S. 619 (1993).

At trial, it was undisputed: (1) that police received reports of a pick-up truck that was sparking and dragging a bicycle under the bumper on NE 148th approaching Glisan in Portland at approximately 8:59 p.m. on June 19, 2003; and of a hit-and-run accident involving a cyclist at NE 148th and San Rafael Avenue at roughly the same time; (2) that Petitioner's pick-up truck was involved in the hit-and-run and was the vehicle seen on NE 148th sparking and dragging a bicycle; (3) that Petitioner was stopped by police at approximately 9:30 p.m. near NE 186th and Stark as he drove his damaged truck, and that he was visibly impaired from

drinking; and (4) that Petitioner had a blood alcohol level of 0.20 grams at 1:31 a.m., of 0.19 at 2:06 a.m., of 0.17 at 3:06 a.m.  It was also undisputed that the victim's bicycle was found at a residence at NE 139th and Burnside, that belonged to a friend of Petitioner's, where Petitioner told police he had been drinking with an acquaintance, "Fernando".

Testimony at trial introduced evidence that Petitioner consistently claimed "Fernando" had taken his truck while he napped and had returned the truck damaged; and that Petitioner was cooperative during the full investigation and sequential interviews before his indictment.  However, there was substantial testimony from numerous police officers who responded to and investigated the incident, including Petitioner's claims that "Fernando" was the hit-and-run driver, that undermined Petitioner's credibility.  The officers' testimony introduced evidence of many inconsistencies in the information Petitioner provided over sequential interviews with respect to his activities, who he was with, and his description of Fernando.  (Tr. Vol. 3 at 61-68; 192-233.)  There was also testimony that particles of glass fell off Petitioner's clothing when he exited his truck; that there was broken glass on the passenger side of the bench seat and floor of the vehicle but none where the driver would have been be seated; and that the coat taken into evidence had what appeared to be glass shards on it.  (Tr. Vol. 3 at 41-42; 46-48; 51-53; 154; 163-69.)  Testimony also introduced evidence of the officers' unsuccessful efforts to locate

"Fernando" by interviewing Petitioner's friends, by reviewing surveillance tapes from a convenience store and from a light-rail ("MAX") station Petitioner had mentioned, by going to the day-labor gathering location where Petitioner claimed to have met Fernando, and by entering the name Petitioner provided in a law enforcement database. (Tr. Vol. 3 at 193-233; Vol. 4 at 1-21; Tr. Vol. 4 at 109-111.) Petitioner's testimony reiterated his claim that Fernando took his truck and returned it damaged, but also introduced his admission that, because he was drunk on June 19, 2003, he could not remember some things he told officers and was not sure of Fernando's last name; and provided further evidence that his accounts of what he did and where he went at various times were inconsistent. (Tr. Vol. 5 at 18-89).

The Court finds that there was compelling and sufficient evidence without McReynolds' identification for the jury to find beyond a reasonable doubt that Petitioner was the hit-and-run driver on June 19, 2003, and, therefore, the admission of McReynolds identification did not have a substantial or injurious effect on the verdict. Accordingly, habeas relief is not warranted.

/ / /

/ / /

/ / /

/ / /

**CONCLUSION**

For the reasons stated above, the Amended Petition for Writ of Habeas Corpus (#31) is DENIED, and this proceeding is dismissed with prejudice.    The Court declines to issue a Certificate of Appealability on the basis that Petitioner has not made a substantial showing of the denial of a constitutional right pursuant to 28 U.S.C. § 2253(c)(2).

IT IS SO ORDERED.

DATED this _l2_ day of ~~Mxxxx~~ April, 2013.

Marco A. Hernandez
United States District Judge